■ In the Matter of the Arbitration between BANK OF NEW YORK, Appellant, and UBS WARBURG LLC, Respondent. [774 NYS2d 1]—

Judgment (denominated an order), Supreme Court, New York County (Charles Tejada, J.), entered May 15, 2003, which denied petitioner's motion to stay arbitration and directed the parties to proceed to arbitration in accordance with CPLR 7503, unanimously reversed, on the law, with costs, and petitioner's motion to stay the arbitration demanded by respondent in its February 5, 2003 notice of intention to arbitrate granted.

UBS Warburg, a stockbroker, seeks arbitration before the

New York Stock Exchange of a dispute concerning its execution of two program trade sale orders, with a value of approximately $46 million, from Bank of New York's unit investment trust (UIT) department on June 22, 2001.

Arbitration is sought pursuant to a standard customer agreement, dated January 18, 1990, between Bank of New York and UBS's predecessor, which contained an agreement to arbitrate "all controversies which may arise between us concerning any transaction or the construction, performance, or breach of this or any other agreement between us pertaining to securities and other property, whether entered into prior, on or subsequent to the date hereof."

The customer agreement was signed on behalf of Bank of New York by Alexander J. Matturri, Jr., an assistant vice-president in the bank's options department, for account number 251-00010, an options trading account. Such agreement was signed at the request of UBS's predecessor's credit manager who, in a letter dated January 12, 1990 and addressed to Mr. Matturri at Bank of New York's Options Group, stated that the predecessor wanted to update the option documentation in its Bank of New York files used by its former clearing agent and asked Mr. Matturri to "please provide us with the following:— Corporate Resolution and Trading Authorization specifying options as an authorized investment—Option Approval Form and Agreement (enclosed)—Customer Agreement (enclosed)."

It is undisputed that the UITs traded by UBS Warburg on Bank of New York's behalf are not options, but investment products similar to mutual funds, which hold a pool of stocks, bonds or other securities for a fixed period of time. Shares or "units" of the UITs are sold to the public and Bank of New York's UIT department provides trustee and custodial services such as: safekeeping portfolio assets; issuing ownership certificates; processing redemptions; distributing payments; redeeming matured securities; and performing general record-keeping tasks. It is also undisputed that the bank's UIT and options departments are separate entities and are managed independently of each other, and that the UIT trade orders in issue were placed by the UIT department with no reference to account number 251-00010.

There is no dispute that the customer agreement contained a valid arbitration clause or that UBS is the successor party to the form agreement. However, in directing arbitration, the IAS court, in holding that Mr. Matturri had general signing authority without restriction, misread his signing authority as an assistant vice-president.

While he was empowered to execute "documents of any type," as an assistant vice-president, Mr. Matturri's signing authority was limited by the Bank of New York's minutes and bylaws "only to the performance or discharge of the duties . . . within [his] particular division or function." Mr. Matturri thus was empowered to bind only the options department for which he worked, and not the entire bank. Such bank-wide binding power was entrusted only to specified individuals (the chairman, the president, any vice-chairman of the board, any senior executive vice-president, any executive vice-president or any senior vice-president) and could be granted only to other officers in writing by the chairman, the president, any vice-chairman of the board, any senior executive vice-president, any executive vice-president, or any senior vice-president. There was no evidence presented that Mr. Matturri was granted such power, and Bank of New York denies that such power was extended to him.

"[A] corporation must necessarily act by agents, and they, 'like natural persons, are bound only by the acts and contracts of their agents done and made within the scope of their authority' " (*Jacobus v Jamestown Mantel Co.*, 149 App Div 356, 362 [1912] [*affd* 211 NY 154 (1914)], quoting *Alexander v Cauldwell*, 83 NY 480, 485 [1881]). Here, Mr. Matturri had only the authority to bind his own department. Nor was there any implied consent, since no senior officer of Bank of New York, with the actual authority to bind the entire bank, took any action which would subject the entire bank to arbitration of every dispute with UBS. Thus, contrary to UBS's contention, Bank of New York denied that its UIT department agreed to arbitration and offered evidence to substantiate its factual allegation (*see Scone Invs., L.P. v American Third Mkt. Corp.*, 992 F Supp 378, 381 [1998]).

UBS has presented no evidence that it reasonably believed that Mr. Matturri had implied or apparent authority to bind the entire bank. When the credit manager at UBS's predecessor forwarded the customer agreement form to Mr. Matturri, there is no showing that she reasonably believed that he had implied or apparent authority to bind the entire bank. Her letter of January 12, 1990 requested only that he update certain forms relating to options trading, not that he negotiate an agreement binding on all departments of the bank. Thus, inasmuch as Mr. Matturri had neither actual nor apparent authority to bind any department of the bank beyond his own options department, the IAS court erred in holding that the customer agreement was executed on Bank of New York's behalf pursuant to a general signing authority without restrictions.

Nor does the fact that the arbitration clause contained broad "all controversies" language change the fact that Bank of New York did not agree to arbitrate every action taken by any department of the bank. While the court in *PaineWebber Inc. v Bybyk* (81 F3d 1193 [1996]) held that words such as "all controversies" were inclusive and elastic enough to encompass disputes so as to place a claim within the scope of arbitration, the reasoning of the *Bybyk* court does not apply here. There, the Second Circuit concluded that, to the extent that a customer agreement was ambiguous, it should be construed against the party that drafted it, there the broker dealer, and in favor of the individual customer seeking arbitration. Here, the situation is just the opposite. UBS's predecessor that selected the language and drafted the agreement, executed by an officer of Bank of New York's options department, and UBS is seeking to force Bank of New York to arbitrate a controversy based upon a trade by its UIT department, which is not clearly and unequivocally covered by the arbitration agreement or the parties' reasonable expectations. Thus, while the plain language of the customer agreement executed by assistant vice-president Matturri of the options department would require arbitration of any controversy between UBS and said department, the IAS court erred in finding that Bank of New York was bound by the customer agreement to arbitrate all matters outside the options department, specifically the matter of the subject UIT trades. Concur—Nardelli, J.P., Andrias, Saxe and Williams, JJ.